**Opinion issued December 17, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00982-CR

————————————

## JUAN CARLOS BARRERA-MAGANA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

### On Appeal from the 338th District Court
### Harris County, Texas
### Trial Court Case No. 1338054

---

## MEMORANDUM OPINION

The State charged Appellant, Juan Carlos Barrera-Magana, with murder.[1]

Appellant pleaded not guilty. The jury found him guilty and assessed punishment

at life imprisonment and a $10,000 fine. In three issues, Appellant argues the

---

[1]  *See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (Vernon 2011).

evidence is insufficient to establish that (1) the non-accomplice evidence tends to connect him with the murder, (2) he committed the murder, and (3) he is responsible for murder under the law of parties.

We affirm.

## Background

Arturo Chavez was involved in human trafficking, smuggling people from Mexico to the United States. Appellant was Chavez's "right hand man" in this enterprise. In 2004, Daniel Torres, Jr. and Santiago Garcia also worked for Chavez in smuggling. On November15, 2004, Appellant and Torres were together in a hotel room they were using to conduct business. Chavez arrived, agitated. Chavez claimed that Garcia "was going to snitch about something." Chavez and Appellant devised a plan. Under the plan, Chavez would pick Garcia up and drive him to a park by Garcia's grandmother's house, where Garcia was living. Torres would drive Appellant to the park and Appellant would kill Garcia at the park by shooting Garcia.

After Chavez left, Torres drove Appellant to the park. During the drive, Torres asked Appellant if he was really going to go through with the plan. Appellant told Torres that he was only going to scare Garcia.

Torres parked near the park but in a location where he could not see the park. After waiting about ten minutes, Appellant received a phone call and got out of the car, walking towards the park. While Appellant was gone, Torres heard multiple

2

gun shots. An autopsy would later show that Garcia had three gunshot wounds. Appellant returned to the car, visibly upset. Appellant said, "I got him, I got him, I shot him."

Appellant and Torres left. Later, on Chavez's instructions, Appellant and Torres went to the house of Francisco Velasquez. Before anyone's arrival, Chavez called Velasquez, explaining that "[t]hat they had killed Guero [i.e., Garcia], and Wacky [i.e., Appellant] and Mouse [i.e., Torres] were on the way to the house." After Appellant and Torres arrived at Velasquez's house, Velasquez "opened the door, [and] they were saying that they had killed [Garcia]."

Chavez showed up with his then-wife, Concepción Chavez Benavides, and their children in the car. Benavides and the children remained in the car. Chavez had a plumber's welding torch. Appellant pulled out a gun, and Chavez tried to destroy the gun with the welding torch. Ultimately, the attempt failed. During this time, Appellant, Chavez, and Torres talked about how they had killed Garcia. After failing to destroy the gun, Chavez, took it apart. He threw one piece into the drainage ditch behind Velasquez's house, and gave the rest to Appellant and Torres.

Chavez, Appellant, and Torres then drove to a park with a pier that extended into the water. At the park, Appellant walked out onto the pier and threw something into the water. Benavides testified at trial, "[H]e was trying to look unsuspicious and because of that, he made himself really stand out."

3

During that night, Chavez told Benavides that Garcia had been killed. At another point that night, Chavez and Appellant were talking about the murder in Benavides's presence. Chavez told Appellant that they had done Garcia a favor by killing him because "the only person that he had was his dad, and his dad was dead and now he could be with his dad." Appellant agreed.

Shortly after the murder, Chavez and his family, Appellant, and Torres went to Mexico. During their stay in Mexico, Chavez and Appellant discussed Garcia's murder multiple times.

### Non-Accomplice Evidence

In his third issue, Appellant argues the evidence is insufficient to establish that the non-accomplice evidence tends to connect him with the murder.

**A.      Standard of Review & Applicable Law**

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). "The accomplice witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999). Accordingly, we do not apply a typical legal-sufficiency review. *Id.* at 462.

4

The State bore the burden of showing other evidence tending to connect the defendant with the offense, and we review whether such evidence exists in the record. *See id.* at 463.

In reviewing the sufficiency of the corroborating evidence, we exclude the accomplice-witness testimony from our review and determine whether there is any other evidence that tends to connect the defendant to the commission of the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). The evidence must link the accused in some way to the commission of the offense and show that rational jurors could conclude that the evidence sufficiently tended to connect the accused to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Malone*, 253 S.W.3d at 257. "[W]hen there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the factfinder's resolution of the evidence." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). In performing our review, we defer to the jury's exclusive province to evaluate the credibility of the witnesses and of the weight to be given their testimony. *See Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). Corroborating evidence may be direct or circumstantial, and it need not be sufficient by itself to establish guilt. *See Cathey,* 992 S.W.2d at 462.

5

**B.    Analysis**

Much of the evidence directly linking Appellant to the murder of Garcia came from Torres.  Torres admitted in his testimony that he was involved in the murder and that he had been charged with the murder of Garcia.  No one disputes that Torres is an accomplice-witness.  *See Smith*, 332 S.W.3d at 439 ("A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law.").  Appellant acknowledges that Velasquez and Benavides testified to some events surrounding the murder but argues that their testimony was insufficient to tend to connect him to the offense.  We disagree.

Velasquez testified that Chavez, Torres, and Appellant came to his house on the night of the murder.  Before they came over, Chavez called Velasquez.  Velasquez testified that, in that telephone call, Chavez said "[t]hat they had killed [Garcia], and [Appellant] and [Torres] were on the way to the house."  After Appellant and Torres arrived at Velasquez's house, Velasquez "opened the door, [and] they were saying that they had killed [Garcia]."  Velasquez testified that Benavides arrived with Chavez but that she remained in Chavez's car the entire time.

Chavez tried to destroy the gun with a small welding torch, but failed.  During this time, Appellant, Chavez, and Torres talked about how they had killed Garcia.  After failing to destroy the gun, Chavez, took it apart.  He threw one piece into the drainage ditch behind Velasquez's house, and gave the rest to Appellant and Torres.

6

Benavides testified that she went with Chavez to Velasquez's house late one night in November 2004. She saw Appellant and Torres there that night. She remained in Chavez's car. After they left, Chavez told her that Garcia had been killed. Later that night, she was present when Appellant and Chavez were talking about the murder. Chavez told Appellant that they had done Garcia a favor by killing him because "the only person that he had was his dad, and his dad was dead and now he could be with his dad." Appellant agreed.

After they left Velasquez's house, Chavez drove Benavides to a park that was along the water and that had a pier extending into the water. Benavides testified she saw Appellant walk out onto the pier and throw something into the water. "[H]e was trying to look unsuspicious and because of that, he made himself really stand out."

Finally, Benavides testified that, shortly after the murder, Appellant, Chavez, and Torres went to Mexico. While there, Appellant and Chavez discussed Garcia's murder on numerous occasions.

The non-accomplice testimony, then, shows that Appellant admitted to Velasquez his participation in the murder, assisted in disposing of the murder weapon, fled the country shortly after the murder, and discussed the murder with Chavez on multiple occasions. Appellant suggests that the testimony of Velasquez and Benavides is insufficient because both contain hearsay statements about what Appellant and others said. Such an argument is not relevant because the only

7

evidence excluded from our review is the testimony of the accomplice-witness. *See Malone*, 253 S.W.3d at 257. When considering the sufficiency of the evidence to support a jury's determinations, we consider all evidence before the jury, including evidence that was improperly admitted. *See Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014). Accordingly, even if statements by Velasquez and Benavides had been improperly admitted, they would still be part of our review.

Appellant also suggests that Velasquez's testimony cannot be credited in our review because he admitted having a number of drinks that night and having some difficulty remembering the details of the night due to the lapse of time between the event and his testimony. Weighing the credibility of a witness's testimony, however, is left to the jury. *See Brown*, 270 S.W.3d at 568.

We hold the evidence was sufficient to support the jury's determination that there was corroborating evidence tending to connect the Appellant with the offense committed. *See* CRIM. PROC. art. 38.14. We overrule Appellant's third issue.

## Sufficiency of the Evidence

In his first issue, Appellant argues the evidence is insufficient to establish that he committed the murder.

## A. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard

of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013). Pursuant to this standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009. We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2788–89 & n.11; *Laster*, 275 S.W.3d at 518.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). An appellate court presumes that the fact finder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the

resolution is rational.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793.  In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.  *Clayton*, 235 S.W.3d at 778.  Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt.  *Powell v. State*, 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

## B.    Analysis

As it relates to Appellant under this issue, "A person commits an offense if he intentionally or knowingly causes the death of an individual."  TEX. PENAL CODE ANN. § 19.02(a)(1) (Vernon 2011).  Appellant argues the evidence is insufficient to show anything more than his presence at the scene of the crime.  We disagree.

In addition to the non-accomplice evidence establishing that Appellant admitted to being involved in the murder to Velasquez, participated in disposing of the murder weapon, and fled the country after the murder, the jury also had the testimony of Torres.  Torres testified that, on the day of the murder, Chavez was agitated, claiming Garcia "was going to snitch about something."  Chavez and Appellant devised a plan.  Under the plan, Chavez would pick Garcia up and drive him to a park by Garcia's grandmother's house, where Garcia was living.  Torres

would drive Appellant to the park and Appellant would kill Garcia at the park by shooting Garcia.

After Chavez left, Torres drove Appellant to the park. Torres parked in a location where he could not see the park. After waiting about ten minutes, Appellant received a phone call and got out of the car, walking towards the park. While Appellant was gone, Torres heard multiple gun shots. An autopsy would later show that Garcia had three gunshot wounds. Appellant returned to the car, visibly upset. Appellant said, "I got him, I got him, I shot him." Later, when they arrived at Velasquez's house, Torres saw that Appellant had a gun. This was the gun that Appellant and Chavez disassembled and threw into the drainage ditch and the water off the pier.

Appellant argues the evidence is insufficient to show that he intended to kill Garcia because Torres testified that, during the ride to the park, Appellant told Torres that he was only going to scare Garcia. Any conflict in the evidence created by this statement was for the jury to resolve. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778.

We hold the evidence was sufficient to support the jury's determination that Appellant committed murder.[2] We overrule Appellant's first issue.

---

[2]     Because the evidence is sufficient to support a determination that Appellant murdered Garcia, we do not need to reach Appellant's second issue, challenging the

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Higley, Huddle, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).

---

sufficiency of the evidence to support his conviction under the law of parties. *See* TEX. R. APP. P. 47.1.